Filed 10/11/22 In re J.W. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. J.W. et al., Defendants and Appellants. | E078427 (Super.Ct.No. J291217) OPINION |

APPEAL from the Superior Court of San Bernardino County. Erin K. Alexander, Judge. Affirmed.

Brent Riggs, under appointment by the Court of Appeal, for Defendant and Appellant J.W.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant T.A.

1

Tom Bunton, County Counsel, Joseph R. Barrell, Deputy County Counsel for Plaintiff and Respondent.

The juvenile court found J.W. came within the court's jurisdiction (Welf. & Inst. Code, § 300, subd. (b)(1))[1], and ordered he continue to be removed from the custody of his parents, defendants and appellants T.A. (Mother) and J.J.W. (Father) (collectively, Parents). Father contends substantial evidence does not support the findings made at the detention, jurisdiction, and disposition hearings. Further, Father asserts the juvenile court erred by failing to state the facts supporting its disposition order. Mother joins in Father's contentions. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. DETENTION

On November 4, 2021, when J.W. was 15 years old, he "was caught stealing food from the Flying J's truck stop." "[T]he security guard at Flying J's was rough with him." The police responded, "and they took [J.W.] to Kaiser Permanente Ontario Medical Center, Emergency Department because of back pain." J.W. said he had been "in a car accident 'a couple of months ago,' he hurt his back, and [his] parents were unable to take [him] to the hospital or doctor[] because they did not have enough money."

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code.

2

J.W. said his paternal grandfather (Grandfather) gave J.W. oxycodone for J.W.'s backpain; J.W. had been taking oxycodone "for a couple of months." At the hospital, J.W. "appeared to be coming down from some unknown substance(s) [and] he himself reported he was detoxing 'from all narcotics.' When asked what narcotics, [J.W.] reported 'only Tramadol.' [J.W.] also reported feeling 'a little loopy' and stated he was having trouble walking." J.W. had "not been to school in 'a couple of months.['] "

J.W. said "his mother and father use 'pain pills' due to their back issues," and Father "was arrested and charged for having two hundred pills on him." J.W. reported that he and his parents had "been homeless for three months, their car was repossessed, and living in the city of Jurupa Valley under an overpass. [J.W.] was unable to give the location of the overpass and stated his parent[s'] cell phone does not have service." Father works for Costco and earns $3,500 per month. The family also receives food stamps. When Father is paid, the family purchases food, but, at other times, J.W. "has to steal food." Plaintiff and respondent San Bernardino County Children and Family Services (the Department) detained J.W. on November 5, 2021, when he was discharged from the hospital.

B.     JURISDICTION AND DISPOSITION

Mother confirmed that she takes oxycodone for back pain. Father confirmed that he takes tramadol for back pain and "he recently weaned himself off oxycodone." Father said his controlled substance arrest was "long ago." Mother provided medical records reflecting (1) on November 5, 2021, in an emergency room, she was prescribed oxycodone for seven days with no refills on the prescription; and (2) on November 28,

3

2021, a doctor cut the strength of Mother's oxycodone prescription by 50 percent and extended the prescription for 14 days. Father provided medical records reflecting that on November 18, 2021, he was prescribed tramadol for 30 days. Mother failed to appear at drug tests scheduled on December 27 and 28, 2021, and January 5 and 19, 2022. Father failed to appear at drug tests scheduled on December 2 and 30, 2021, and January 13, 2022.

On January 3, 2022, the Department social worker spoke to J.W, who said Grandfather "is addicted to pain medication and that [Grandfather] used to blame [J.W.] for taking [Grandfather's] medications.[2] [J.W.] admitted his parents did take medications from others. . . . [J.W.] described there is addictions issues [*sic*] by parents and grandparents. . . . [J.W.] admitted to taking Oxycodone and also admitted to abusing it. He knows he needs help and he described struggling with withdrawal symptoms. He reported that medication was prescribed to him for pain but he admitted that the parents were giving him more than he was prescribed. He reported that at one point he was taking 125mg a day of Oxycodone. [J.W.] knows he needs to get stay away [*sic*] and he wants to go in[to a] treatment program in Tarzana. . . . [J.W.] admitted he is addicted to pain medication and that parents may be as well. [J.W.]

---

**2** The record reflects that, on January 3, 2022, J.W. was discussing his maternal grandfather. However, we infer that "maternal" is a typographical error and the social worker meant "paternal." We make this inference because J.W.'s maternal grandfather died of a heroin overdose, seemingly when Mother was younger. Further, the record reflects Mother, Father, and J.W. lived with J.W.'s paternal grandparents and that Grandfather gave J.W. oxycodone.

admits that he is very worried about his parents given the things he has been seeing them say and do."

On January 18, 2022, J.W. "had unauthorized contact with the parents by email. [J.W.] was emotionally upset and having suicidal ideations. [J.W.] was subsequently hospitalized on this day and he remains in the hospital." J.W. was still in the hospital on January 26, 2022.

At the combined jurisdiction and disposition hearing, on January 26, 2022, Parents' attorneys asserted Parents use, but do not abuse, prescription pain medication. Father's attorney asserted Grandfather gave J.W. oxycodone and "[t]here's no information that the parents were aware of [J.W.'s] use."

J.W.'s attorney and the Department argued that Parents abuse prescription pain medications and that Parents were giving J.W. more oxycodone than he was prescribed. Further, the Department argued that Parents "no-showed all of their [drug] tests" and Parents' medical records did not "justify the regular use" of narcotic pain medications.

The juvenile court found, "[I]t's clear that the entire family was abusing Oxycodone . . . . There is no medical documentation that shows that it was appropriate for long-term use for the parents, what we have is some emergency room visits. [¶] We also have the information that they were encouraging and providing [J.W.] with more than what's prescribed. He, at his young age, is able to recognize that he now has an addiction to that pain medication and believes that the parents do as well. He's in the best position to know of their history of that use." The court further remarked that Parents "missed the drug testing that they agreed to. They were advised that the Court

consider[s] that as [a] positive test." The juvenile court concluded, "[Parents] were willingly administering additional prescribing [*sic*] Oxycodone to him which led to a serious drug addiction on his behalf."

The juvenile court found true the allegations that J.W. is at risk of serious physical harm because: (1) Parents failed "to supervise or protect the child adequately"; (2) Parents willfully or negligently failed to provide J.W. "with adequate food, clothing, shelter, or medical treatment"; and (3) Parents were unable to provide regular care for J.W. due to their substance abuse. (§ 300, subd. (b)(1).) The factual allegations to support those assertions included: (A) Parents have untreated substance abuse problems; and (B) on November 4, 2021, J.W. "was found alone and unsupervised [and was] caught stealing food from a truck stop."

As to the disposition, the juvenile court found "that continuance in the home of the parents is contrary to [J.W.'s] welfare and that there's a substantial danger to the physical health and safety and no reasonable means [to] protect him ab[sent] the removal." Thus, the court ordered J.W. continue to be removed from Parents' physical custody.

## DISCUSSION

### A. DETENTION

Parents contend that, at the detention hearing, the juvenile court erred by ordering J.W. detained from Parents' physical custody. The Department asserts that the "findings and orders made at detention are generally made moot by the jurisdiction and disposition determination and thus cannot be considered on appeal."

6

"[A] detention order . . . is a temporary order that lasts only until the placement decision is made in a dispositional order." (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1420, fn. omitted.) In other words, detention orders are superseded by disposition orders. This court cannot provide any effectual relief by reviewing the superseded detention order, which means Parents' challenge to the detention order is moot. (*In re Julien H.* (2016) 3 Cal.App.5th 1084, 1088, fn. 7.)

B.      <u>JURISDICTION</u>

Parents contend the jurisdiction findings are not supported by substantial evidence.

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

A child comes within the jurisdiction of the court under section 300, subdivision (b)(1), when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian

7

to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

### 1. *SERIOUS PHYSICAL HARM DUE TO THE INABILITY TO ADEQUATELY SUPERVISE*

The juvenile court found J.W. is at substantial risk of suffering serious physical harm due to Parents' inability to adequately supervise or protect J.W. (§ 300, subd. (b)(1).) In terms of the facts, the juvenile court found Parents have untreated substance abuse issues.

J.W. told the social worker that the "[P]arents did take medications from others" and that "there is addictions issues [*sic*] by parents." That evidence indicates Parents are addicted to prescription medications. Father said that he "weaned himself off oxycodone" because the clinic that had been providing his prescription "changed management and he was no longer able to get a prescription." That evidence indicates that Father's oxycodone prescription had a questionable basis because if there were a legitimate basis for the prescription, Father presumably could have kept his prescription despite a change in management. Parents failed to appear at all of their drug tests and had been informed that the failure to appear would be deemed a positive test result. Parents' avoidance of all the drug tests indicates a drug problem. The foregoing evidence supports the finding that Parents abuse prescription pain medications.

J.W. "admitted that the parents were giving him more than he was prescribed," i.e., more oxycodone and tramadol. J.W. is addicted to pain medication. In January 2022, J.W. "described struggling with withdrawal symptoms," and he "want[ed] to go

8

in[to a] treatment program." When J.W. was initially taken to the hospital in November 2021, he "appeared to be coming down from some unknown substance(s) [and] he himself reported he was detoxing 'from all narcotics.' When asked what narcotics, [J.W.] reported 'only Tramadol.' [J.W.] also reported feeling 'a little loopy' and stated he was having trouble walking."

One could reasonably conclude from the foregoing evidence that Parents' addiction led them to provide drugs to J.W., who in turn became addicted to the same drugs as Parents. By providing drugs to J.W. to the point that he was feeling " 'loopy,' " struggling to walk, and addicted, Parents failed to adequately supervise and protect J.W. As a result of the family's shared addiction, J.W. is at risk of serious physical harm or illness due to the potential for overdosing or accidents that could occur when he and/or Parents are under the influence, e.g., J.W.'s difficulty walking. Thus, there is substantial evidence that Parents are unable to adequately supervise or protect J.W., which places J.W. at substantial risk of serious physical harm. (§ 300, subd. (b)(1).)

## 2.  *SERIOUS PHYSICAL HARM DUE TO LACK OF CARE*

Next, the juvenile court found J.W. has suffered, or there is a substantial risk J.W. will suffer, serious physical harm because Parents failed "to provide the child with adequate food, clothing, shelter, or medical treatment." (§ 300, subd. (b)(1)).

On November 5, 2021, J.W. "reported he was in a car accident 'a couple of months ago,' he hurt his back, and [his] parents were unable to take [him] to the hospital or doctor[] because they did not have enough money. [J.W.] was given Oxycodone by

9

[Grandfather]. [J.W.] stated [Grandfather] had 'a problem' with Oxycodone but has now gotten better. [J.W.] stated he had been taking Oxycodone for a couple of months because of the car accident but then reported he stopped taking them a couple of months ago. [J.W.] appeared to be coming down from some unknown substance(s) as he himself reported he was detoxing 'from all narcotics.' When asked what narcotics, [J.W.] reported 'only Tramadol.' [J.W.] also reported feeling 'a little loopy' and stated he was having trouble walking but denied assistance from [the social worker]. [J.W.] reported taking Tramadol and stated he last took it on 11/03/2021 as the pills ran out and his parents did not have money to refill the prescription."

In January 2022, J.W. "reported that medication was prescribed to him for pain but he admitted that the parents were giving him more than he was prescribed. He reported that at one point he was taking 125mg a day of Oxycodone. . . . [J.W.] wants to go in[to a] treatment program in Tarzana."

One could reasonably conclude from the foregoing evidence that Parents failed to provide J.W. with adequate medical care when his back was injured in the car accident because they did not seek medical attention for him. Instead, Grandfather gave J.W. oxycodone, which led to J.W.'s addiction to pain medication. It appears that, at some point, Parents did seek medical attention for J.W. because J.W. said Parents gave him more pain medication than was prescribed, which implies that J.W. went to a doctor and pain medication was prescribed to him. However, seeking that care did not remedy the previous lack of care because Parents ultimately gave J.W. more pain medication than was prescribed to him, which furthered his drug addiction to the point that he had

visible withdrawal symptoms and struggled to walk. In sum, Parents failed to provide J.W. with medical care, did not intervene to prevent him from becoming addicted to drugs, and then gave J.W. excessive amounts of the drugs to which he was addicted. One could reasonably conclude from that evidence that Parents did not provide J.W. with adequate medical care.

We turn to whether the lack of care was due to negligence. Section 300 is meant to protect children from the "pervasively negligent conduct of their parents or guardians." (*Jordy v. Humboldt* (1992) 11 Cal.App.4th 735, 743.) Section 300 "does not extend to every isolated lapse of parental judgment that a [judge] may in retrospect find negligent. No one would suggest a child could be taken from its parent where the parent, in an isolated lapse, failed to prevent the child from darting into the street, or failed to provide adequate training in the use of roller skates, or left a ladder leaning in a place where the child might find it. [Citation.] Yet in each of these examples, a child could potentially sustain [an] injury . . . , and a [judge] could potentially find the injury was the result of parental neglect." (*Id.* at p. 744.)

Father earns $3,500 per month and the family receives food stamps. This evidence reflects that Parents have an income. On November 5, 2021, Parents were both seen in the emergency room, and Mother was prescribed oxycodone. On November 18, 2021, Father went to the doctor and was prescribed Tramadol. This evidence reflects Parents could afford medical care to obtain their prescriptions. Mother "took pre-Med courses for a year and also classes to become a[n] X-ray tech." This

11

evidence indicates that Mother is educated about medical issues and therefore would understand that J.W.'s back pain required professional medical attention.

One could reasonably conclude from the foregoing evidence that Parents had money for medical care and understood the need for medical care, but they failed to provide J.W. with proper medical care for his back pain. Instead, Parents delayed taking J.W. to a doctor and then gave J.W. excessive amounts of oxycodone and tramadol, which led to him being addicted to the medications, and led to him being intoxicated to the point of "feeling 'a little loopy' " and "having trouble walking." The lack of proper medical care and the giving of excessive medication went on for months, which indicates the lack of adequate medical care for J.W. was a pervasive issue thereby demonstrating negligent conduct. (§ 300, subd. (b)(1) ["the willful or negligent failure of the parent or guardian to provide the child with . . . medical treatment"].) In sum, the juvenile court's finding is supported by substantial evidence.

## C.   DISPOSITION

### 1.   *SUBSTANTIAL EVIDENCE*

Parents contend the order removing J.W. from Parents' physical custody is not supported by substantial evidence. The standard of review is set forth *ante*, so we do not repeat it here.

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional

12

well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

The record reflects that Parents are addicted to prescription pain pills. In particular, Parents failed to appear for all of their drug tests; J.W. said that Parents take other people's medications; and J.W. said "there is addictions issues [*sic*] by parents." Parents gave J.W. excessive amounts of prescription pain pills, and J.W. became addicted to the pills. J.W. suffered withdrawal symptoms and felt he needed to go to a treatment center to overcome his addiction.

One could reasonably conclude from the foregoing evidence that if J.W. were to live with Parents he would be at risk of his addiction becoming further entrenched because (1) Parents are addicted to the same drugs as J.W., and (2) Parents supplied J.W. with the drugs. Thus, there is substantial evidence of a substantial danger to J.W.'s physical health if he were returned home, and there are no reasonable means by which J.W.'s physical health can be protected without removing J.W. from Parents' physical custody. (§ 361, subd. (c)(1).)

### 2. *STATEMENT OF FACTS*

Parents contend the juvenile court erred by not stating the facts supporting the removal order. "The court shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

13

When making the jurisdiction findings, the juvenile court made express factual findings. For example, the court found "that the entire family was abusing Oxycodone. . . . There is no medical documentation that shows that it was appropriate for long-term use for the parents, what we have is some emergency room visits." The juvenile court did not repeat the relevant facts in the disposition phase of the hearing. However, the court did adopt various recommended findings from the Department's jurisdiction and disposition report, such as Parents having failed to make "progress in alleviating [their] problems." Between the facts stated by the juvenile court in the jurisdiction phase of the hearing and the adopted findings that Parents had not made progress with their issues, there was a sufficient factual explanation for the removal order.

Further, in the jurisdiction phase of the proceedings, Parents argued that they used, but did not abuse, prescription medications. Parents' primary argument against jurisdiction and removal was addressed in the jurisdiction phase by the court stating the facts supporting its rejection of that argument, e.g., "There is no medical documentation that shows that it was appropriate for long-term use for the parents, what we have is some emergency room visits." Perhaps the juvenile court could have made a clearer record by repeating the relevant facts in the disposition phase of the hearing, but, given the numerous facts the court stated in the jurisdiction phase of the hearing and the adopted findings in the disposition phase, we conclude the juvenile court did not err.

14

**DISPOSITION**

The disposition order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
Acting P. J.

We concur:

RAPHAEL _____
J.

MENETREZ _____
J.